UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DENISE DUDICH, ) | CASE NO. 1:12CV2244 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| ) | LIMBERT |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN[1], ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Denise Dudich ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

## I. PROCEDURAL AND FACTUAL HISTORY

On December 11, 2007, Plaintiff applied for DIB, alleging disability beginning October 23, 2006. ECF Dkt. #12 ("Tr.") at 14.[2] Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011 ("DLI"). Tr. at 16. The SSA denied Plaintiff's DIB application initially and on reconsideration. Tr. at 80-81. Plaintiff requested an administrative hearing, and on October 21, 2010, an ALJ conducted an administrative hearing, where Plaintiff testified and was represented by counsel. Tr. at 44-79. The ALJ also accepted the testimony of Gene Burkhammer, a vocational expert ("V.E."). On December 17, 2010, the ALJ issued a Decision

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

denying benefits. Tr. at 14-23. Plaintiff filed a request for review, which the Appeals Council denied on June 28, 2012.  Tr. at 1.

On September 4, 2012, Plaintiff filed the instant suit seeking review of the Decision.  ECF Dkt. #1.  With leave of the Court on February 21, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #19. On April 8, 2013, Defendant filed a brief on the merits. ECF Dkt. #20.  A reply brief was filed on April 22, 2013. ECF Dkt. #21.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was thirty-seven years of age on the alleged onset date and forty-one years of age at the hearing, suffered from degenerative disc disease and bipolar disorder, which qualified as severe impairments under 20 C.F.R. §404.1520(c). Tr. at 16.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 ("Listings").  Tr. at 16.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary  work as defined in 20 C.F.R. §404.1567(a), except that she is limited to occupations that require not more than occasional climbing on ramps and stairs only, and she must avoid climbing ropes, ladders or scaffolds.  She can never kneel, crouch, or crawl and can only occasionally stoop; cannot be exposed to occupational hazards, such as machinery and unprotected heights, and is limited to simple and routine tasks with only superficial and occasional contact with coworkers and the public.  Finally, Plaintiff cannot perform fast paced production such as assembly line work. Tr. at 18.

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a retail sales person, inside phone salesperson, talent scout, and outside salesperson, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupation of assembler, with 1,000 jobs in Northeastern Ohio, 8,000 jobs in Ohio, and 200,000 jobs nationally. Tr. at 23. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

### A. Hearing testimony

At the hearing. Plaintiff testified that she owns a condominium that she shares with her two-year old daughter. Tr. at 49. She quit her job as a traveling salesperson because she could not sit, and, therefore, fly or drive, for long periods of time. Tr. at 50. She is currently enrolled at Lakeland Community College where she is pursuing a certificate in medical coding. Tr. at 54. Her education is funded through a government loan. She attends school two days per week, and she attends two classes per day. Her first class of the day is three hours, and her second class is two and a half hours, with a break in between classes.

Plaintiff testified that she experiences constant back pain that radiates down her left leg, which ranges in intensity on any given day. Tr. at 56-57. She can sit for thirty minutes, but cannot walk for more than six minutes without a rest. Standing still is difficult for Plaintiff, she explained that she must pace if she is required to stand. Plaintiff is a recovering alcoholic[3], so she has limited her prescription pain medication to Darvocet, which "helps sometimes" but makes her groggy and sleepy. Tr. at 59. She testified that she "takes other things" to offset the Darvocet in order to remain

---

[3]Plaintiff has been sober since 2002.

clear-headed at school. Plaintiff has also undergone injections and nerve blocks in an effort to alleviate her pain. Plaintiff testified that she has trouble sleeping due to her pain. Tr. at 68.

Plaintiff suffers migraine headaches approximately two times per week. She takes medicine at the onset of a migraine, but until the medication takes effect, she takes her daughter to her mother's house and then rests in a dark room. Tr .at 59.

At the hearing, Plaintiff described herself as "anti-social." Tr. at 64. Plaintiff testified that she experiences crying spells and shops in one-half-hour increments because she "can't handle people." Tr. at 69, 71. In order to address her mental problems, Plaintiff is prescribed Paxil, 10 m.g., Trileptal, 150 m.g. as well as Restoril, 15 m.g. as a sleep aid. Tr. at 61. Plaintiff initially testified that the medication does not help, but conceded later that she refused medication at first but is actually better now that she takes medication. Tr. at 62.

Plaintiff testified that she has difficulty concentrating and explained that she intends to withdraw from a biology class due to an inability to grasp the material. Tr. at 64. Despite her difficulty with the biology class, Plaintiff maintains a 3.2 grade point average. At the hearing, Plaintiff explained that she recently requested an accommodation when tests are given due to her ADHD.

At home, Plaintiff cares for her daughter, does laundry, and grocery shops, but her mother vacuums the condominium and makes meals. Tr. at 65, 69. Plaintiff studies two hours per week, and spends the remainder of her time watching television. Tr. at 67. She lays on the floor most of the time in an effort to alleviate her back pain. She attends two Alcoholic Anonymous meetings per week. Plaintiff explained that she typically attended daily meetings in the past. She attributed attending fewer meetings to her poor energy level. She takes medication for hypothyroidism.

**B.     Medical evidence**

According to a medical source report completed on September 5, 2008 by Michael Vento M.D., Plaintiff visited Dr. Vento in May of 2006 complaining of lower back pain and knee pain. Tr. at 349. A lumbar MRI was performed on May 11, 2006, which revealed mild dextroscoliosis; T12-L1 disc desiccation with small non-compressive right foraminal disc protrusion and left facet arthrosis, L3-4 posterior annular disc bulging, eccentrically greater to the left; L4-5 disc desiccation,

-5-

posterior annular disc bulging with annular tear and facet arthrosis with effusions; and L5-S1 rotatory spondylolisthesis greater to the right, degenerative disc disease, posterior annular disc bulging with annular tear, foraminal stenosis impinging the right and possibly the left exiting L5 nerve roots, facet arthrosis, right L5 spondylolysis, and possible left L5 spondylolysis. Tr. at 338-339. Lumbar x-rays revealed Grade II spondylolisthesis L5 on S1, bilateral sacral pars defects, and dextroscoliosis centered at the upper lumbar spine between L1 and L2 measuring approximately 22 degrees. Tr. at 393. Dr. Vento referred Plaintiff to "spine specialist," Michael Eppig, M.D. Tr. at 349. In the medical source report, Dr. Vento noted that Plaintiff's diagnoses including bilateral chondromalacia, scoliosis, and spondylolisthesis. Tr. at 349.

Plaintiff presented to Dr. Eppig on June 14, 2006 in consultation for back and left leg pain. Tr. at 273. She reported aggravation of pain with wearing heels, doing housework, and increased general activities. On exam, Plaintiff prescribed Abilify and Paxil, and exhibited increased lumbar lordosis and a marked prominence to the lumbosacral mid line posterior soft tissues with mild tenderness. However, she had a normal gait, stance, heel and toe walk, and toe touch. Likewise, hyper-extension, side bending and manual motor testing was normal. She had tenderness to deep palpation in the mid line at the lumbosacral junction and a very modest right thoracolumbar scoliosis but stood with a level pelvis.

Dr. Eppig diagnosed congenital spondylolisthesis and spinal stenosis, lumbar. He concluded that "it is highly likely that [Plaintiff] is going to eventually need decompression and fusion given the degree of foraminal narrowing, the degree of slip and her history as described." Tr. at 274. Nonetheless, Dr. Eppig wrote that Plaintiff had an "essentially intact neurologic exam" and that she should continue with conservative management for as long as possible.

Plaintiff presented to Dr. Hissa on October 4, 2006 for a second opinion regarding her low back pain and knee pain. Tr. at 373. Plaintiff sought nonnarcotic, nonoperative options. She demonstrated poor forward flexion at the back and tenderness and Dr. Hissa recommended Celebrex and exercise.

According to a letter dated October 23, 2006, David A. Demangone, M.D. , Plaintiff began treating with Dr. Demangone in October of 2006 for pain management. Tr. at 249. Her left knee

pain had been present for sixteen months, and standing and walking aggravated her pain. Plaintiff occasionally had numbness in the ball of her left foot and weakness in her left leg with walking. Dr. Demeangone's exam revealed "a middle aged woman in no distress" with "good lumbar spine ROM." Tr. at 250.  However, right lateral lumbar flexion increased her left knee pain.  The examination further revealed hypoesthesia in the anterior left thigh and left lower leg region. Tr .at 250. Dr. Demangone opined that Plaintiff might be suffering from an underlying chronic lumbar radiculitis secondary to spondylosis in her lumbar spine and that she should be placed on Medrol dose packs and if ineffective, recommended epidural steroid injections and eventually surgery. Tr. at250.

Plaintiff's pain had returned on November 22, 2006 following temporary relief with Medrol packs. Tr. at 248. Lumbar epidural steroid injections were administered on December 4, 2006, which worsened her pain.  Tr. at 242. Plaintiff was prescribed Cymbalta.  Tr. at 242. On February 22, 2007, Plaintiff reported pain straight across her low back and in her left knee and she received a caudal epidural steroid injection, Tr. at 240-41, which provided no relief. Tr .at 239.  She was depressed about the pain and she was not sure if Cymbalta had helped. She indicated having a new onset of pain from her left knee down into her foot.

Lumbar x-rays on May 30, 2007 evidenced idiopathic scoliosis with a high left curve from T2 to T9 of 14 degrees and a right T9 to L3 curve of 25 degrees. Tr. at 275. There was also a fifty percent spondylolisthesis of L5 on S1 with a pars defect.  On June 7, 2007, Plaintiff reported continued pain in her low back and sacrum and in the left medial thigh down the knee and shin. Tr. at 272.  She was unable to walk for more than twenty minutes. Her back was tender to deep palpation at the lumbosacral junction.  Plaintiff consented to proceeding with a decompression laminectomy, foraminotomy, and instrumented fusion with bonegrafting, however, her surgery could not be scheduled until she stopped all nicotene use for one month.  Tr. at 271.  At a July 26, 2007 appointment with Dr. Eppig, Plaintiff stated that she was in considerable pain but was unable to stop smoking.  Tr. at 271.

On October 4, 2007, Plaintiff complained to Dr. Eppig of ongoing back pain but conceded that she could not quit smoking. Tr. at 270. Dr. Eppig prescribed Chantix. On February 8, 2008,

Plaintiff told Dr. Eppig that she had been exercising and lost some weight. Tr. at 269. Her exam was essentially normal and unchanged. Dr. Eppig advised that surgery for her spondylolisthesis was elective and that there was no harm in delaying the surgery.

In a letter to Plaintiff's private disability insurance carrier on August 22, 2008, regarding the denial of benefits, Dr Eppig noted that he had reviewed all of the medical records of Dr. Sayegh[4], Dr. Vento, and Dr. Hissa. Tr. at 265. Dr. Eppig opined that the carrier had listed the wrong diagnosis[5] and that Plaintiff actually had spondylolisthesis of L5-S1 with resulting L5 foraminal spinal stenosis, which "is the disabling factor, which is providing the dramatic back pain." Tr. at 265. Dr. Eppig urged reversal of their denial of benefits and cited his experience as a "board certified orthopaedic surgeon with fellowship training in spinal surgery" and having "been in full time practice of orthopaedic spinal surgery for 24 years." Tr. at 266.

Plaintiff was seen in mental health therapy on January 5, 2007 for diagnoses of depression and anxiety due to past issues and current somatic problems. Tr. at 299. Elena DiFranco, M.A., recommended that Plaintiff participate in abuse therapy as she was exhibiting symptoms of PTSD and was having difficulty with sleep. On January 5, 2007, Plaintiff reported that her increased pain was exacerbating her depression. On March 6, 2007, Plaintiff reported increased anxiety as a result of finances and back pain. Tr. at 298. She reported her ongoing struggle with depression on May 9, 2007.

On January 8, 2009, Plaintiff presented to William M. Boros, M.D., with postpartum depression and she did not feel safe at home due to mental/verbal abuse. Tr. at 356. She was assessed with anxiety and depression and was prescribed Zoloft. Tr. at 356. On April 6, 2009, Plaintiff was diagnosed with anxiety, postpartum depression, and irritable bowel syndrome. Tr. at 354. Although she had some improvement in her sleep while taking Zoloft, it was replaced with Lexapro. Tr. at 354.

---

[4]According to Dr. Eppig's letter, Plaintiff sought treatment from Dr. Sayegh for knee pain.

[5]Dr. Demangone's medical records indicate that Plaintiff suffers from spondylosis lumbar spine with myelopathy – the allegedly incorrect diagnosis referred to in the denial of benefits. Tr. at 240. However, Dr. Eppig apparently did not have access to Dr. Demangone's medical records.

A psychiatric evaluation was completed on April 15, 2009 by Robin Krause, CNS, of Signature Health. Plaintiff reported suffering from depression since she was a teenager, which had worsened since recently giving birth to her daughter. Tr. at 360. She had tried several medications in the past that caused various unwelcome side effects. Tr. at 360. She was impulsive and had mood swings, sleep difficulties, and panic attacks. Plaintiff related a history of being prostituted by a pimp who abused her and that she had nightmares and flashbacks from that time in her life. Tr. at 361. Her speech was rapid at times and her thoughts were suspicious. Her insight, judgment and reasoning appeared to be impaired due to her mood problems. Tr. at 362. She was diagnosed with Bipolar Disorder NOS, History of Polysubstance Abuse, and Posttraumatic Stress Disorder and prescribed Abilify and Paxil. A few weeks later Abilify was replaced with Seroquel due to significant side effects. Tr. at 359.

On April 29, 2009, Erin E. Houser, M.Ed., PC, of Signature Health, in a letter to the Lake County Department of Job and Family Services, observed that Plaintiff was being treated at the facility and that her symptoms were "currently severe enough that they would interfere with her ability to obtain and sustain employment." Tr. at 369. CNS Krause completed a Mental Functional Capacity Assessment form on May 15, 2009, in which she concluded that Plaintiff had marked limitations in the following mental abilities: understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, making simple work-related decisions, asking simple questions or request assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, responding appropriately to changes in the work setting, being aware of normal hazards and taking appropriate precautions, and setting realistic goals or make plans independently of others. Tr. at 366. The form was co-signed by Douglas McLaughlin, D.O.

On June 29, 2009, Gina Sinito, PCC, ATR at Signature Health wrote a "To Whom it May Concern" letter advocating that extra time should be provided to Plaintiff when tests and quizzes were administered at school due to her anxiety and poor concentration. Tr. at 370. CNS Krause completed a Medical Statement Regarding Bipolar Disorder and Related Conditions on July 17,

2009, in which she opined that Plaintiff suffered from numerous symptoms and panic attacks that result in a complete inability to function independently outside the area of her home. Tr. at 363. CNS Krause further opined that Plaintiff suffered from recurrent and intrusive recollections of a traumatic experience which are a source of marked distress.  Further, CNS Krause opined that Plaintiff was markedly impaired in the following mental abilities:  understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 364. CNS Krause noted Plaintiff's deficiencies of concentration, persistence or pace, which resulted in frequent failure to complete tasks in a timely manner, repeated episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from the situation or experience exacerbation of signs and symptoms, and numerous additional moderately-rated mental limitations. Tr. at 363-364. Lastly, CNS Krause opined that Plaintiff would be absent from work more than three times a month due to her impairments or treatment. Tr. at 364.

Plaintiff's Paxil dosage was increased on September 8, 2009. Tr. at 384. On January 2, 2011, Plaintiff reported that she was irritable and anxious. Tr. at 381. She resumed Seroquel on February 5, 2010 and she was instructed to discontinue Paxil for Wellbutrin. Tr. at 380.  At her appointment on February 24, 2010, Plaintiff exhibited mood swings Tr. at 379. CNS Krause believed that Plaintiff posed a risk to herself and her child because of her erratic moods and it was decided that Plaintiff  would be "pink slip[ped]" to the hospital in order to stabilize her mood.  On March 19, 2010, she was feeling better but was still experiencing some anxiety. Tr. at 378. Restoril was initiated to help with sleep. On June 22, 2010, Plaintiff reported doing very well in school but that she had some irritability and impulsive behavior.. Tr. at 376. CNS Krause thought that her increased irritability may have been related to the increased dosage of  Paxil so it was reduced to 10 mg. day. During an office visit on August 3, 2010, Plaintiff reported being irritable and edgy at times. Tr. at 388. Trileptal was prescribed. She was diagnosed with Mood Disorder NOS.

Plaintiff was seen in the emergency room of Lake Hospital System on January 18, 2011 with suicidal thoughts. Tr. at 417. She indicated that she had an incident with her father over the weekend which brought up past childhood abuse. Tr. at 407. She was not found to meet the criteria for involuntary inpatient admission but she expressed interest in the partial hospitalization program. Tr. at 406. She was discharged in improved condition to follow-up at Laurelwood. Tr. at 418.

### C.     State Agency Physicians

State agency consultative psychological examiner Jeff Rindsberg, Psy.D. examined Plaintiff on April 28, 2008, where she related having a "dramatic" and violent childhood including being sexually abused by her father and three others. Tr. at 307. She was not taking any prescribed medication at the time and related a bad experience with Prozac. Tr. at 308. Dr. Rindsberg observed that Plaintiff had poor eye contact and seemed to be picking at her hands. Tr. at 309. She also appeared on edge and irritable at times. Plaintiff reported daily mood swings and frequent crying spells. She admitted to suffering panic attacks. During the exam, she committed two errors when subtracting serial sevens from 100. Tr. at 310.

Dr. Rindsberg diagnosed Bipolar Disorder NOS and Alcohol Dependence, Full Sustained Remission and assigned a Global Assessment of Functioning ("GAF")[6] score of 55. Tr. at 311. Dr. Rindsberg opined that Plaintiff is mildly impaired in her ability to maintain attention and perform simple, repetitive tasks and her ability to relate to others, including fellow workers and supervisors and moderately impaired in her ability to withstand the stress and pressures associated with day-to-day work activities. Likewise, state agency psychological consultant Joan Williams, Ph.D. opined on May 17, 2008 that Plaintiff retains the ability to "complete simple to moderately complex tasks, interact with others and work in a setting without precision work." Tr. at 329.

State agency consultative physical examiner Franklin D. Krause, M.D. examined Plaintiff on May 21, 2008, where Plaintiff reported that she does minimal cooking, no cleaning or shopping,

---

[6]GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, *e.g.*, how well or adaptively one is meeting various problems-in-living. A score of 51 - 60 indicates moderate symptoms (*e.g.*, flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

-11-

can sit for forty minutes while driving, stand for twenty-five minutes, and walk for five to ten minutes. Tr .at 332. She demonstrated reduced dorsolumbar spine ranges of motion. Tr. at 335. Dr. Krause diagnosed moderate scoliosis and spondylolisthesis, markedly symptomatic, and noted that she has significant spondylolisthesis at L5-S1 with evidence of impingement on the left L5 nerve root. Tr. at 332.  Dr. Krause offered no specific recommendations regarding her ability to function. However, state agency medical consultant Thomas Vogel, M.D. opined in a form dated June 9, 2008 that Plaintiff retained the ability to perform work at the medium exertional level with only occasional climbing of ladder/rope/scaffolds, stooping, and crouching and no exposure to unprotected hazardous heights and dangerous machinery.  Tr. at 340-347.

### D. Plaintiff's arguments

Plaintiff advances three arguments in this appeal. First, Plaintiff contends that the ALJ erred at step three of the sequential analysis, that is, the ALJ did not consider whether Plaintiff's back problems equaled a listing, or whether the combination of her back problems and mental problems equaled a listing.  Second, Plaintiff asserts that the ALJ violated the treating physicians' rule when he gave little weight to the opinion of her treating clinical nurse specialist.  Finally, Plaintiff argues that the SSA failed to meet its step five burden, that is, to demonstrate that there exists other work in significant numbers in the national economy that Plaintiff can perform.

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii) ). An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415.  An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by the medical evidence are equivalent in severity and duration to that of a listed impairment. See *Land v. Sec'y of H & HS*, 814 F.2d 241, 245 (6th Cir.1986) (citing 20 C.F.R. § 1526(b)). A decision of medical equivalency, however, must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques. *Id.*

-12-

It is the claimant's burden to show that he or she meets or medically equals an impairment in the Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987) (per curiam).

Because the listings establish a presumption of disability without consideration of a claimant's age, education or work experience, and represent an automatic "screening in" based only on a claimant's medical findings, the claimant must meet the strict evidentiary standard described above. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885 (1990).

Plaintiff contends that she meets or equals the listing in 1.04, captioned "Disorders of the spine," which reads, in its entirety:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> >
> > OR
> >
> > B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
> >
> > OR
> >
> > C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The ALJ provided the following analysis of Plaintiff's degenerative disc disease under Listing 1.04: "[Plaintiff] does not meet Listing 1.04 (disorders of the spine) because she does not have evidence of any spinal arachnoidotis, nerve root compression or spinal stenosis.  In addition, there is evidence that [Plaintiff] can ambulate effectively as defined under 1.00B2b."  Tr. at 20.

Plaintiff cites *Reynolds v. Commissioner of Social Security*, 424 F. App'x 411 (6th Cir.2011), to support her contention that this case should be remanded for the ALJ to explicitly discuss her

-13-

back problems under 1.04 as well as her impairments in combination. *Reynolds*, however, is distinguishable. In *Reynolds*, "the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments." *Reynolds*, 424 F. App'x at 415. The court explained that, "in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the claimant] put forth could meet [Listing 1.04]." *Id.* at 416. Here, Plaintiff has not made such a showing. The ALJ specifically addressed Listing 1.04, and Plaintiff does not identify evidence in the record to establish that she meets or equals the listing, but contends instead that this case should be remanded so the ALJ can articulate a more thorough analysis at step three. Plaintiff writes in her reply brief, "[Plaintiff's] citation to parts of the medical record in her [ ] Brief were to illustrate the harmfulness of the ALJ's error. They were not cited to prove to this Court that her impairments did, indeed, meet Listing 1.04(A), even though she believes this to be true." ECF Dkt. #21 at 2.

"Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426(1969). "No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir.2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) ). Here, although Plaintiff correctly argues that there is evidence of spinal stenosis in the record, Plaintiff has not shown that she meets the requirements of the remainder of subsection C of the Listing.

Plaintiff has not provided an adequate basis to conclude that remand for the ALJ to more fully explain his step three analysis might lead to a different result. The regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence.

Next, Plaintiff contends that the ALJ failed to consider her impairments in combination. Here, the Commissioner correctly observes that the ALJ makes express reference to the consideration of the "combination of impairments" in concluding that such impairments do not meet

-14-

or medically equal the severity of any of the listed impairments in the Listings. A reference to "a combination of impairments" by the ALJ in the hearing decision is sufficient to satisfy the requirement. See *Gooch v. Sec'y of HHS*, 833 F.2d 589, 591–92 (6th Cir.1987), cert. denied, 484 U.S. 1075 (1988); *Loy v. Sec'y of HHS*, 901 F.2d 1306, 1310 (6th Cir.1990)("An ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effect of the impairments in combination where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet the listings.").

Having concluded that the ALJ considered Plaintiff's severe impairments individually and in combination, and having also concluded that the ALJ's determination that Plaintiff's impairments individually and in combination do not meet or equal a Listing, the Court finds that Plaintiff's first argument is not well taken.

Next, Plaintiff contends that the ALJ erred in giving limited weight to the opinion of her treating clinical nurse specialist. Nurse practitioners are not included in the list of acceptable medical sources found in the Commissioner's regulations. 20 C.F.R. § 404.1513(a). The opinions of nurse practitioners, even treating nurse practitioners, are therefore not entitled to the controlling weight or deference to which the opinions of treating physicians are ordinarily entitled. *Starr v. Comm'r of Social Security*, 2013 WL 653280, *5 (S.D. Ohio), citing 20 C.F.R. §§ 404.1527(d). However, administrative law judges are vested with the "discretion to determine the proper weight to accord opinions from 'other sources' such as nurse practitioners." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir.2007)(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir.1997)).

Evidence from other sources, including nurse practitioners, may be considered "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.1513(d)(1). Among the factors to be considered in evaluating the opinions of these "other sources" are the length of time and frequency of treatment, consistency with other evidence, the degree to which the source presents relevant evidence to support the opinion, how well the opinion is explained, whether the source has a special expertise, and any other factor supporting or refuting the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5 (Aug. 9, 2006).

An administrative law judge need not weigh all the factors in every case; the evaluation depends on the particular facts in each case. See *id.* at *5. However, the administrative law judge "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." *Id.* at *6.

Here, the ALJ wrote that he gave limited weight to CNS Krause's opinion because "her opinion of marked limitations in many functional areas simply is not consistent with her own findings and [Plaintiff's] reported activities." Tr. at 25. Specifically, the ALJ cited CNS Krause's opinion that Plaintiff had a marked limitation in making simple work decisions as being inconsistent with her reports that Plaintiff was earning A's and B's in an academic program. *Id.* Therefore, the ALJ gave a specific reason for giving only limited weight to the opinion of the treating nurse practitioner. Substantial evidence supports the ALJ's decision, and, as s consequence, Plaintiff's second argument lacks merit.

Finally, Plaintiff contends that the ALJ erred in concluding that other work exists in significant numbers in the national economy that Plaintiff can perform. The ALJ relied upon the VE's testimony that Plaintiff is capable of performing a single job in reaching that conclusion. there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupation of assembler, with 1,000 jobs in Northeastern Ohio, 8,000 jobs in Ohio, and 200,000 jobs nationally. In *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988), which Plaintiff quotes in her brief, the Sixth Circuit found that 1,350 positions constituted a significant numbers of jobs in local and national economy. See also *Stewart v. Sullivan*, No. 89-6242, 1990 WL 75248, at *4 (6th Cir. June 6, 1990), cited in *Harmon v. Apfel*, 168 F.3d 289, 292 (6th Cir. 1999)(125 jobs in local geographic area and 400,000 jobs nationwide constituted "significant number of jobs" within the meaning of 42 U.S.C. § 423(d)(2)(A)). More recently, in *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574 (6th Cir. 2009), the Sixth Circuit found that "the ALJ's count of 2,000 jobs [for one position] available in the third category withstands Nejat's challenge." Id. at 579. Based on existing case law, the number of jobs available according to the VE's testimony constitutes a "significant number of jobs." See, e.g. *Martin v. Comm'r of Soc. Sec.*,

170 F. App'x 369, 375 (6th Cir. 2006) ("870 jobs can constitute a significant number in the geographic region."). Accordingly, Plaintiff's final argument is not well taken.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: November 5, 2013

                                         */s/George J. Limbert*
                                         GEORGE J. LIMBERT
                                         UNITED STATES MAGISTRATE JUDGE